# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

### Dallas Division

| | | |
|---|---|---|
| KELLY MCGOWAN, Individually;<br>JESSICA CLOUSE, Individually;<br>LINDSAY HEYMAN, Individually;<br>MEGHAN KLEIN, Individually;<br>SYDNEY SEVERSON, Individually;<br>REBEKAH TATE, Individually;<br>MARISSA JENNINGS, Individually;<br>LAUREN MOORE, Individually;<br>LAURA KADE, Individually<br><br>Plaintiffs,<br><br>v.<br><br>SOUTHERN METHODIST<br>UNIVERSITY;<br><br>Defendant. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Case No.: 3:18-CV-00141-N |

_____

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Kelly McGowan, Jessica Clouse, Lindsay Heyman, Meghan Klein, Sydney Severson, Rebekah Tate, Marissa Jennings, Lauren Moore, and Laura Kade, Plaintiffs, and hereby file this Original Complaint against Southern Methodist University ("SMU"), Defendant, and for cause of action would show this Court and Jury as follows:

## INTRODUCTION

This is a gender discrimination and negligence case. Plaintiffs were, at all times relevant, female student athlete rowers at SMU. Throughout the course of their participation as SMU rowers, Plaintiffs were treated inequitably as compared to male student athletes. SMU allocated, and continues to allocate, substantially more funding and higher quality resources to male athletics than to female athletics. Plaintiffs were provided inferior resources, including limited access to qualified training personnel and substandard medical treatment. As a result of SMU's failure to provide access to competent coaching, medical and training personnel, Plaintiffs suffered catastrophic labral tears in one, or both, of their hips after routinely being subjected to an unreasonably rigorous training and practice regimen and inappropriate rowing and weightlifting techniques. Each Plaintiff has had, or will require surgery as a result of these debilitating hip injuries. Worse, each Plaintiff will likely require multiple, full hip replacements over the course of her lifetime. SMU's gender discrimination and negligence in causing Plaintiffs' catastrophic hip injuries were, and still are, devastating to Plaintiffs. This suit seeks justice for SMU's illegal acts.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4) because Plaintiffs' legal claims arises under 20 U.S.C. §1681, *et seq* and its interpreting regulations.

2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a) because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

3.   SMU receives federal financial assistance and is therefore subject to the dictates of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681.

4.   Venue is proper pursuant to 28 U.S.C. § 1391(b). These claims arose in Dallas, Texas which is within the jurisdiction of this court.

### JURY DEMAND

5.   Plaintiffs demand a jury trial on all issues so triable.

### PARTIES

6.   Defendant Southern Methodist University ("SMU") is a private university located in Dallas, Texas.  SMU is governed by a Board of Trustees and may be served with process via its President, R. Gerald Turner at 6425 Boaz Lane, Dallas, Texas 75205.

7.   Plaintiff Kelly McGowan ("McGowan") was, at all times relevant, a student at SMU and a student athlete participating in SMU's Women's Rowing Team ("SMU Rowing").

8.   Plaintiff Jessica Clouse ("Clouse") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

9.   Plaintiff Lindsay Heyman ("Heyman") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

10.   Plaintiff Meghan Klein ("Klein") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

11.   Plaintiff Sydney Severson ("Severson") was, at all times relevant, a student and SMU and a student athlete participating in SMU Rowing.

12.   Plaintiff Rebekah Tate ("Tate") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

13. Plaintiff Marissa Jennings ("Jennings") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

14. Plaintiff Lauren Moore ("Moore") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

15. Plaintiff Laura Kade ("Kade") was, at all times relevant, a student at SMU and a student athlete participating in SMU Rowing.

## TITLE IX OF THE EDUCATIONAL AMENDMENTS OF 1972

16. Title IX, enacted in 1972, provides in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

20 U.S.C. § 1681(a). The Civil Rights Restoration Act of 1987 made plain Congress' intent that the terms "program or activity," as used in Title IX, mean any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. §1687. Thus, Defendant is subject to Title IX even if none of the funding for either its men's or women's athletic programs comes from federal sources, if it otherwise receives federal assistance.

17. In 1975, the Department of Health, Education and Welfare ("HEW" – the predecessor of the United States Department of Education ("DOE")) adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. Part 106. (The DOE regulations adopting the HEW regulations are at 45 C.F.R. Part 86.) The Regulations are enforced by the Office for Civil Rights ("OCR") within DOE.

18. With regard to athletic programs, 34 C.F.R. § 106.41(a) provides that intercollegiate and club athletics are included within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

19. 34 C.F.R. § 106.41(c) specifies ten (10) non-exclusive factors that may be considered in the determination of equal athletic opportunity:

    a. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

    b. The provision of equipment and supplies;

    c. Scheduling games and practice time;

    d. Travel and per diem allowance;

    e. Opportunity to receive coaching and academic tutoring;

    f. Assignment and compensation of coaches and tutors;

    g. Provision of locker rooms, practice and competitive facilities;

    h. Provision of medical and training services

    i. Provision of housing and dining facilities and services; and

    j. Publicity.

20. Other factors to be considered are a school's "failure to provide necessary funds for teams for one sex" and recruiting.

21. In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics. This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation").

22. The Policy Interpretation provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas: (1) equal athletic participation opportunities (34 C.F.R. §106.41(c)(1)); (2) equal treatment and benefits to those with participation opportunities (34 C.F.R. §106.41(c)(2)-(9)); and (3) equal athletic financial assistance (34 C.F.R. §106.37).

23. According to the Policy Interpretation, compliance in the area of the first prong of equal athletic participation opportunities is determined under the following three-part test: (1) whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; (2) where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or (3) where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program. *See* 44 Fed. Reg. 71, 418.

24. This three-part test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"), making clear that "participation opportunities must be real, not illusory."

25. The Regulations require that sponsors of intercollegiate athletics (such as Defendant) take such remedial actions as are necessary to overcome the effects of sex discrimination in violation of Title IX. *See* 34 C.F.R. §106.3(a). Defendant has not taken any recent remedial actions to satisfy its obligations under Title IX. Nor has Defendant ever provided females with an equal opportunity to participate in varsity athletics or provided equal treatment and benefits to its female athletes, and any remedial actions which Defendant has taken in the past years have been insufficient to satisfy Defendant's obligations under Title IX.

26. The Regulations also require that federal fund recipients like Defendant adopt nondiscrimination policies and grievance procedures, appoint and train Title IX officers to receive and investigate sex discrimination complaints, and disseminate this information to all students, faculty, and employees. 34 C.F.R. §§106.8 & 106.9. The Regulations further require that recipients promise and confirm compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance. 34 C.F.R. §106.4.

27. The Equity in Athletics Disclosure Act (EADA) requires the disclosure of information about varsity teams and the financial resources and personnel that the school dedicates to those teams. Any coeducational institution of higher education that participates in Title IV, the federal student aid program, and has an

intercollegiate athletics program, must comply with the *EADA* by preparing an annual report, officially called *The Report on Athletic Program Participation Rates and Financial Support Data,* more commonly known as the EADA Report. 34 C.F.R 668.47.

28. The Regulations further require that sponsors of interscholastic athletics comply with the athletics regulations within three years of their effective date (which was July 21, 1975). Defendant did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter. Now, 40 years later, Defendant still does not fully comply with Title IX.

29. Section 106.51(a)(3) states: "A recipient shall not enter into any contractual or other relationship which directly or indirectly has the effect of subjecting employees or students to discrimination."

30. As set forth above, a school's provision of equal treatment and benefits to those with participation opportunities is assessed based on an overall comparison of the male and female student athletic programs.

31. Defendant has unlawfully discriminated against female student athletes, including Plaintiffs, in violation of Title IX with respect to athletic treatment and benefits in several areas including but not limited to: (1) the assignment of and access to quality coaching; (2) the provision of equitable medical and training services and facilities; (3) funding and fundraising opportunities; (4) recruiting; and (5) support services. 34 C.F.R. § 106.41(c); 44 Fed. Reg. 71,416.

## FACTUAL ALLEGATIONS RELATED TO ALL PLAINTIFFS

### SMU Athletic Programs

32. For decades, in a failed effort to meet Title IX requirements related to equal participation opportunities for male and female student athletes, SMU has played a numbers game.

33. Between 1986 to 2004, SMU added women's programs in soccer, cross country, track and field, volleyball, rowing and equestrian. Four of these – cross country, track and field, rowing and equestrian – share two characteristics attractive to the university: large rosters and low budgets. SMU increased the boost these programs added to its female participation numbers further by eliminating its men's track and cross-country teams when it added the women-only equestrian team in 2004. SMU fails to recognize that higher participation numbers alone do not equal a winning score when it comes to Title IX.

34. As early as 2004, the SMU school newspaper highlighted the unequal treatment experienced by female athletes, including SMU rowers. A rower was quoted in the article: "We train very hard, and we're not asking for more support than other programs, just an equal amount." Unfortunately, nothing changed – except the lives of dozens of young women who committed to SMU rowing. In the 13 years that followed this SMU rower's plea, the rowing team remained marginalized. While SMU struggled to keep the participation numbers up and the rowing roster filled to support SMU's claims of gender equity, it provided the rowing team with inferior resources, equipment, access to coaching and training personnel, and medical care. SMU continued, and continues, to discriminate against female athletes on the basis of their gender.

35. Rowing at SMU began with the team's inception in 1999.  Like other universities at the time, SMU added the women-only team in large part to bolster its female participation numbers in an attempt to comply with Title IX.

36. Doug Wright served as an assistant coach during the inaugural 1999-2000 season before being promoted to head coach, a position he retained until 2017. Longtime assistant coach Jessi Hooper was a member of that first team, trained under Wright and was hired as an assistant coach in 2007.  Paige Love was hired as an assistant to coach the novice team in 2014. All three left SMU's employment in the summer of 2017 without explanation.

37. In an attempt to build the rowing team roster, SMU engaged in both formal and informal recruiting. Unable to attract enough experienced rowers, each year SMU posted flyers on campus and approached women with athletic backgrounds or experience in other sports who were deemed good candidates. Women were enticed to join the rowing team with promises of increasing opportunities for scholarships and financial aid.

38. Plaintiffs are informed, believe, and on that basis allege, that SMU and the SMU Athletic Department paid little attention to the rowing program.  Rather, the rowing program was used as a mechanism to comply with Title IX's requirement that there be equal participation of female and male athletes.

## SMU Provides Inequitable Funding to Women's Teams Generally And to the All-Female Rowing Team Specifically.

39. SMU budgets and spends significantly less overall for women's sports than for men's sports. For example, SMU's 2015-16 EADA report reflects recruiting expenses of $1,129,090 for men's teams and only $253,697 for women's teams.

40. SMU's 2015-16 EADA report reflects operating expenses for the male-only 117-member football team of $1,784, 631, or a per participant expense of $15,253. In contrast, the report reflects operating expenses of $217,456 for the female only 51-member rowing team, or a per participant expense of $4,264.

**SMU Fails to Provide Equity in the Assignment of and Access to Quality Coaching**

41. SMU provides male athletes with greater access to coaching, providing female athletes with fewer numbers of, less experienced, and more overburdened coaches than male athletes.

42. In the 2015-16 EADA report, SMU reported an average annual institutional salary of $906,588 for its head coaches of men's teams and an average annual institutional salary of $114,778 for head coaches of women's teams. In the same year, SMU reported an average annual institutional salary of $249,893 for assistant coaches for men's teams and an average annual institutional salary of $57,947 for assistant coaches of women's teams.

**SMU Rowing Utilized an Unconventional Rowing Form
Using Inappropriate Equipment**

43. Generally, there are two predominate rowing forms: sculling and sweeping.  Despite these universally accepted rowing forms, Coach Wright employed his own unique rowing form that differed from both sculling and sweeping. As a member of SMU's inaugural rowing team in 1999, Assistant Coach Hooper had only trained under Wright and perpetuated this unconventional technique.

44. Plaintiffs are informed, believe, and on that basis allege, that the unconventional rowing form employed by the SMU Rowing coaching staff placed SMU Rowers in a position that significantly stressed the hip joint contributing to the cause of Plaintiffs' hip injuries.

45. Plaintiffs are informed, believe, and on that basis allege, that the oars the SMU coaching staff elected to use were of an inappropriate size, length and weight for female rowers, particularly when used with the unconventional technique. The coaching staff was advised of the inappropriate nature of the oars but disregarded warnings and continued to require rowers to use them.

**SMU Rowers Were Subjected to Unreasonable Training and Practice Regimens**

46. SMU Rowing maintained an unreasonably rigorous practice and training regimen.

47. SMU rowers were required to engage in an unreasonable weight training regimen that placed SMU rowers at a high risk for injury, including hip injuries.

48. Plaintiffs are informed, believe, and on that basis allege, that in or around 2012 or 2013, SMU commissioned the Carrel Clinic to audit the SMU rowing program to determine what was causing the unusually and disproportionally high amount of hip injuries in the rowing program.  The Carrell Clinic auditors observed rowing practices, training, and competition.  The Carrell Clinic auditors presented SMU with recommendations for modifications to the rowing program to help prevent future hip injuries.  Plaintiffs are informed, believe, and on that basis allege that despite receiving recommended modifications to the program, SMU failed to implement the recommended modifications.

49. During the 2010 through 2015 seasons, SMU rowing had access to only one weight training coach to coach and supervise 30-35 rowers.

50. SMU rowers were also required to perform Olympic weightlifting techniques ("Olympic Lifts").  These Olympic Lifts are extremely technical, and dangerous if not performed correctly.  Olympic Lifts significantly engage the hip joint and surrounding musculature. Despite the Olympic Lifts high degree of technicality and danger if performed

incorrectly, SMU rowers were given very little instruction for performing these highly technical weightlifting techniques.  Given that SMU rowing was allotted a single weight lifting coach for the entire team, SMU rowers received virtually no supervision or correction while performing these Olympic Lifts.

51. Further endangering the SMU rowers, and increasing the likelihood of injury, SMU rowers were consistently encouraged to increase the amount of weight they were lifting, even without any assurances that they were performing the Olympic Lifts correctly. Rowers were often told that if they were not increasing weight with each weight lifting set, they were not trying hard enough.

52. Beginning in the 2015-16 academic year, SMU hired new trainers to supervise the weight lifting program.  These new trainers informed Plaintiff Heyman, who had been performing Olympic Lifts with virtually no prior coaching or supervision, that she was performing the Olympic Lifts incorrectly.

53.  SMU also employed unreasonable training volume.  Almost daily, rowers were forced to jump from long, water based rowing workouts, to intense weightlifting workouts, to ergometer or other workouts.  These workouts were to be completed with little rest in between.

### The "Deal With It" Culture of The Rowing Program

54. The SMU Rowing coaches generally maintained a culture that ignored injuries and encouraged rowers to continue training and rowing through pain.

55. Often times, when rowers complained of pain, they were told to simply stretch more, or engage in other minimal activities to relieve pain.

56. Injured rowers were subjected to heavy pressure by the coaching staff to return to regular training and practice, even while still engaging in treatment and recovery for their injuries.

57. Even when rowers returned to full training, the coaching staff would, at times, make comments indicating that rowers should have returned to regular training much sooner.

58. When rowers complained of pain or injuries, they were often told that pain was just part of the sport, or part of getting older, despite only being in the 18-22 age range.

59. The coaching staff often retaliated against rowers who were injured. Even though injured rowers could not participate in practice, the coaching staff required injured rowers to attend practice, and just sit and watch. Injured rowers were not allowed to engage in any physical therapy, or other recovery training during this time.

60. Some injured rowers experienced derogatory remarks made by the coaching staff when the injured rowers were unable to perform certain training techniques or programs due to injury.

61. The coaching staff directed SMU rowers not to talk to any rowers who had been medically disqualified.

62. Upon information and belief, Plaintiffs allege that the SMU Rowing coaching staff as well as other SMU athletic staff, including the Athletic Director, were aware of, intentionally disregarded and actively concealed the nature, extent and cause of the injuries being suffered by rowers

### SMU Rowers Were Provided Substandard, Second Class Athletic Training And Medical Attention

63. SMU rowers were generally treated as second class citizens by the SMU athletic training staff. For example, if a male, football or basketball team member was present in the

training room with an SMU rowing athlete, the male athlete was consistently given priority of treatment over the female SMU rowing athlete.

64. The SMU rowing program was only assigned a single athletic trainer who was shared with another team.  Until 2016, the trainer assigned to rowing was also assigned to the football program, and often prioritized treatment for football players over rowers.

65. SMU rowers were also treated with a formulaic treatment plan of ice, heat, and Transcutaneous Electrical Nerve Stimulation ("TENS Therapy") despite the availability of myriad other treatment modalities and equipment which were routinely utilized for rehabilitating other athletes.

66. Unlike other athletic programs in which athletic trainers were present during practices, athletic trainers were not present during SMU rowing practices.

67. Plaintiffs maintain they were not afforded equal access to quality medical care. Throughout the relevant time period SMU provided athletes, including rowers, medical care through the Carrell Clinic. Team physicians and physical therapists associated with the Carrell Clinic examined and treated athletes both on campus and at the clinic.

68. Plaintiffs' complaints of pain were routinely dismissed or minimized by the coaching and training staff. Even when Plaintiffs referred to a team physician, diagnostic testing and/or physical therapy was often denied or delayed. Plaintiffs maintain male athletes were not similarly discounted.

69. Based on information and belief, SMU Equestrian athletes, all of which are female, were also subjected to substandard medical and training treatment, as well as unequal access to training facilities and personnel.

### SMU's History of Non-Compliance and Unethical Conduct

70. SMU's intentional disregard for legal requirements, policies and regulations is not limited to issues related to Title IX. SMU has a long and checkered past in athletics–one that includes its football program bearing the distinction of being the only Division I program ever to receive the "death penalty" from the NCAA.

71. In September 2015, the NCAA Division I Committee on Infractions (COI) issued a Public Infractions Decision on SMU's <u>tenth</u> major infractions case. This time the investigation involved the men's golf and men's basketball programs and the compliance office.

72. After defining Level I violations as "severe breaches of conduct," the COI concluded that SMU committed Level I violations because "institutions act through their staff and the institution's staff committed multiple Level I violations in this case" including providing false and misleading information to the NCAA enforcement staff, committing academic fraud, engaging in impermissible recruiting activities and failing to promote "an atmosphere of compliance."

73. After defining Level II violations as "significant breaches of conduct," the COI concluded that SMU committed a Level II violation when it permitted the former director of compliance to submit falsified documents related to its probation compliance in a previous infractions matter to the Committee on Infractions.

74. Citing the NCAA bylaws, the COI noted the following as "Aggravating Factors for the Institution":

   a. 19.9.3-(b): A history of major violations by the institution;

   b. 19.9.3-(e): Unethical conduct, failing to cooperate during an investigation and refusing to provide all relevant or requested information;

    c.  19.9.3-(h): Persons of authority condoned, participated in or negligently disregarded the violation or related wrongful conduct;

    d.  19.9.3-(m): Intentional, willful or blatant disregard for the NCAA constitution and bylaws.

75.  Penalties imposed by the NCAA include a three-year probation period and a $5,000 fine plus one percent of the total budget for the men's basketball and golf programs, among other restrictions.

### BACKGROUND FACTS RELATED TO PLAINTIFF McGOWAN

76. McGowan enrolled at SMU in the fall of 2014. She is a current student at SMU.

77. Having participated in rowing in high school, McGowan was recruited by SMU Rowing Head Coach Doug Wright ("Coach Wright"), Assistant Coach Jessi Hooper ("Coach Hooper"), and Recruiting Coordinator Bill McLean ("McLean"). Prior to entering SMU, McGowan never had any injuries associated with rowing, particularly involving her hip.

78. SMU offered McGowan an athletic scholarship to participate in SMU Rowing. Entering her freshman year, McGowan received a 50 percent scholarship. As a result of her performance, by the end of her freshman year, McGowan's scholarship increased from 50 percent to 65 percent.

79. McGowan began to experience pain in her hips during the Fall of 2015.

80. McGowan first noticed pain during winter training, which was focused primarily in her hip and shoulder. In February of 2016, after a weight room workout involving Olympic lifting, McGowan experienced excruciating hip pain while using the ergometer. McGowan got off the ergometer and informed SMU Rowing trainer, Megan Ervin ("Ervin"). While being assessed by the trainer, Coach Wright indicated that McGowan

just needed to "stretch it out."  McGowan was instructed by Ervin to stop rowing and stop using the ergometer.

81. For the next seven weeks, McGowan visited the training room almost daily and did physical therapy twice weekly during her personal time.

82. During her entire recovery, McGowan was constantly subjected to remarks from Coach Wright and the other coaches pressuring her to get back to rowing as soon as possible, consistent with the pressure to return alleged herein.

83. McGowan also went to the SMU Sports Medicine doctor, Dr. Michael Khair ("Dr. Khair"), who merely provided her anti-inflammatories.  Further, despite annual physicals by SMU trainers and doctors each year, SMU never gave her any restrictions regarding rowing as a result of her physical.

84. In her first week back to rowing, the coaches made McGowan complete a 2,000 meter or "2K" row on the ergometer, one of the most physically challenging exercises for the rowers.  She competed in the last two races of the season and was still experiencing pain in her hip.

85. When McGowan returned to SMU for her junior year in the fall of 2016, she informed Ervin that she still had a lot of pain in her hip and that she had difficulty waitressing over the summer and walking around during her shifts.  In response, Ervin indicated that pain was just a part of getting old, despite McGowan only being 20 years old at the time.

86. McGowan attempted to row during the first couple of workouts but still was experiencing pain.  She began a second round of physical therapy and was instructed to do the same exercises as before, despite their previous ineffectiveness.  She was also required by the

SMU Rowing coaching staff to continue rowing in a single boat, being instructed to only row using her arms and body.  McGowan's hip pain persisted.

87. McGowan again visited Dr. Khair, who failed to make any progress in diagnosing McGowan's injury.

88. Despite two unsuccessful rounds of physical therapy and despite McGowan's persistent pain, neither an MRI nor X-Ray was ordered for McGowan by SMU.  McGowan specifically requested an MRI and X-Ray be ordered by her trainer, but her request was ignored.  Exasperated due to SMU's unresponsiveness, McGowan's mother had to contact SMU to insist she get an X-Ray, which was finally ordered.

89. In early November 2016, Athletic Trainer Megan Ervin told McGowan during a practice that the X-Ray showed that she had significant hip dysplasia. Ervin told her that the condition was hereditary and "just the way [her] hips were built." Ervin told McGowan that she had informed Coach Wright.

90. Coach Wright approached McGowan after practice and told her that he heard she had "really bad hip dysplasia," and added that it was "worse than Meaghan Klein's."

91. After receiving her X-Ray, McGowan then met with Dr. Khair, who informed her that her X-Ray revealed she had developed significant adult hip dysplasia, which was a genetic condition unrelated to any acute, or overuse injury.  Dr. Khair indicated he did not believe she had any labral tears, which would indicate an acute or overuse injury. McGowan never received an MRI to confirm Dr. Khair's diagnosis.

92. Based on his diagnosis, Dr. Khair concluded that medical disqualification from rowing was her only option.

93. McGowan was medically disqualified by SMU in the Winter of 2016.  After her medical disqualification, McGowan went to get treatment in the training room at SMU and was told by Ervin that she could not provide McGowan with any more help.

94. As a result of her medical disqualification, McGowan did not receive any more increases to her scholarship, which she would have undoubtedly received if she was able to continue rowing.  McGowan's previous performance resulted in her getting a percentage increase in her scholarship after her freshman year and all seniors on SMU Rowing were given a full scholarship.

95. After her medical disqualification, in the summer of 2017, McGowan sought a second opinion from an independent medical provider who ordered X-Rays, an MRI, and a CAT Scan of McGowan's hips.  Based on the imaging, McGowan was diagnosed with an anterior labral tear with partial detachment, femoroacetabular impingement, and a sports hernia.  There was no finding of hip dysplasia, as she had been told by SMU coaches, trainers and physicians. In fact, McGowan was advised that she <u>did not</u> have hip dysplasia or if she did, it was very mild.

96. McGowan was advised that she would need arthroscopic surgery, a sport hernia surgery, and multiple hip surgeries.  She was told that she risked having the hips of a 70-year-old by the age of 30.

97. In or about August of 2017, McGowan and her parents met with Rick Hart, SMU's Director of Athletics, to discuss the handling of McGowan's injuries.  During this meeting, Hart informed McGowan and her parents that SMU would not pay for any future medical procedures or treatment as Dr. Khair had diagnosed McGowan with a hereditary condition, and therefore SMU was not responsible.

98. Hart further denied that there were an alarming number of SMU rowers who had medically disqualified with labral tears. He quickly told McGowan and her parents that only four or five girls "on record" as being medically disqualified with labral tears.

99. McGowan maintains that she was denied further testing and medically disqualified based on hip dysplasia for two reasons: (1) A diagnosis of a hereditary condition would reduce SMU's financial responsibility and (2) SMU would not have to acknowledge another rower had suffered a labral tear.

100.    Throughout her participation as an SMU rower, McGowan was subjected to the unconventional rowing form taught, and required, by the SMU rowing coaching staff.

101.    Throughout her participation as an SMU rower, McGowan was subjected to the unreasonably rigorous training and practice regimen alleged herein.

102.    Throughout her participation as an SMU rower, McGowan was subjected to the "Deal With It" culture alleged herein.

103.    Throughout her participation as an SMU rower, injury, surgery and rehabilitation, McGowan was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

104.    In addition to facing multiple medical surgeries and other forms of treatment, McGowan currently remains in a condition where she cannot run, walk, stand or sit for long periods of time without experiencing extreme pain or discomfort.

### BACKGROUND FACTS RELATED TO PLAINTIFF CLOUSE

105.    Clouse enrolled at SMU in the fall of 2013. She graduated from SMU in the spring of 2017.

106.　　　Prior to attending SMU, Clouse had never participated in rowing, though she did participate in soccer and tennis in high school.  She first learned of SMU Rowing through a letter she received in the mail from SMU discussing the walk-on process and inviting her to try out for the team.  As a recruiting tactic, SMU sent letters to incoming freshman with previous athletic experience.  Prior to entering SMU, Clouse never had any injuries involving her hips.

107.　　　Clouse reached out to Coach Hooper and attended tryouts run by Coaches Wright and McLean at which time she was taught basic rowing form on the ergometers.

108.　　　SMU conducted a physical on Clouse and she was deemed healthy with no restrictions regarding participation in SMU Rowing.

109.　　　Upon joining SMU Rowing, Clouse was placed on the novice team, which was subordinate to the varsity.  By the spring of 2014, novice team practices combined with varsity team practices.  Practices amounted to approximately 20 hours a week.

110.　　　Clouse moved up to the SMU Rowing varsity team in or about August 2014, leading into her sophomore year.

111.　　　In January 2015, Clouse began to experience pain in her hips.  On or about April 8, 2015, in the middle of a 2,000 meter or "2K" row on the ergometer, Clouse's hip locked.  She stopped rowing and immediately informed SMU Rowing trainer Recia Schuil ("Schuil").

112.　　　Despite informing Schuil, Clouse was forced to participate in a grueling Saturday morning practice that included sprints on water. Sobbing from the pain in her hip, she asked that she be allowed to stop practicing but recently hired Assistant Coach Paige Love told her that she had not been "officially injured" and must continue.

113.      On or about April 21, 2015, SMU Sports Medicine doctor, Dr. Daniel Worrel
("Dr. Worrel"), examined Clouse's hip and instructed her to get an MRI and see Dr.
Muller, SMU's referring surgeon.  On April 28, 2015, after reviewing Clouse's MRI and
X-Rays, Dr. Muller informed Clouse that she had a labral tear on her left hip and that she
would need surgery.

114.      After learning of her need for surgery, in the spring of 2015, Clouse met with
Coach Wright who informed her that after she recovered from surgery, Clouse would not
be allowed to return to the team because most of the girls who returned ended up
reinjured. Coach Wright informed Clouse that as a walk-on athlete with no scholarship
obligations, he did not want the injuries to negatively impact the rest of her life.  Clouse
was never medically disqualified by SMU and, instead, was simply told that she would
not be allowed to return to the team.

115.      Clouse was not offered any accommodations as a result of her injury.  Her pain
became so excruciating that she had to miss several classes due to the pain she felt while
sitting in a chair in class.

116.      Prior to the surgery, Clouse's father asked SMU about her ability to get a second
opinion and potentially see a surgeon of the family's choosing.  Clouse's father was
informed that such efforts would be at Clouse's personal expense and SMU would not
pay for a surgery by a different surgeon.

117.      Prior to her hip surgery, Clouse broke her ankle and tore several ligaments in an
incident unrelated to rowing.  She had surgery on that ankle and, due to the pain in her
hip, was unable to perform various strengthening exercises for her ankle during her
physical therapy, greatly affecting her recovery from her ankle injury.

118.     Clouse had arthroscopic hip surgery to fix her labrum and reshape her femur head on or about December 23, 2015.  After her surgery, Clouse was informed that although the surgery went well, she remained at an increased risk for hip replacement later in life.

119.     Throughout the spring semester of 2016, Clouse continued to receive treatment from SMU team medical providers, including physical therapy at the Carrell Clinic and follow up appointments with Dr. Muller.

120.     As a result of her injury and removal from the team, Clouse lost the potential of earning a scholarship.  Plaintiffs are informed, believe and on that basis allege that SMU Rowing awarded scholarships for rowers who posted a time under eight minutes on their 2,000 meter or "2k" rowing test.  On the day of her "2k" test, the same day of her injury when her hip locked, Clouse was on pace to post a time below 8 minutes, thereby qualifying her for a scholarship.

121.     Throughout her participation as an SMU rower, Clouse was subjected to the unconventional rowing form taught, and required, by the SMU rowing coaching staff.

122.     Throughout her participation as an SMU rower, Clouse was subjected to the unreasonably rigorous training and practice regimen alleged herein.

123.     Throughout her participation as an SMU rower, Clouse was subjected to the "Deal With It" culture alleged herein.

124.     Throughout her participation as an SMU rower, her injury, surgery and rehabilitation after surgery, Clouse was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

125.    Despite SMU's prognosis regarding the success of Clouse's surgery, Clouse

continues to experience pain in her hip and still cannot sit for extended periods of time or

take part in any sort of strenuous physical activity without discomfort.

**BACKGROUND FACTS RELATED TO PLAINTIFF HEYMAN**

126.    Heyman enrolled at SMU in the fall of 2013. She graduation from SMU in the

spring of 2017.

127.    Prior to entering SMU, Heyman began rowing in the summer of 2011, going into

her junior year of high school.  She rowed both recreationally and competitively in high

school.  This included attending summer camp for novice rowers, rowing on the high

school club team, and competing in competitive events.  Heyman eventually rowed for

her high school varsity team, as well as took part in indoor ergometer competitions. In the

fall and spring of her senior year of high school, Heyman also engaged in a weight

training program that did not involve Olympic lifts.  Prior to entering SMU, Heyman

never had any injuries associated with rowing, particularly involving her hip.

128.    Heyman first met Coach Wright in the summer of 2013 at the "Independence

Day Regatta."  After visiting SMU on a recruiting trip, Heyman was offered a 75 percent

scholarship to attend SMU and join SMU Rowing, an offer which Coach Wright

indicated was off the table if she did not decide within a week.

129.    Upon entry to SMU and every year thereafter, SMU provided a physical by SMU

trainers and team doctors.  In 2013, it was noted in her physical that her hip was negative

for any impingement, and that her hips had equal range of motion.

130.    Beginning in December 2013, Heyman began to experience back pain. Despite

reporting this, she continued to participate fully in SMU Rowing for the remainder of the

season, including the arduous weight lifting program. Coach Wright insisted that the pain

she was experiencing was due to a lack of stretching. Heyman followed Coach Wright's

instructions and sought help in the training room before practices multiple times a week.

131.     In the spring of 2014, Heyman also began experiencing hip pain, which she

reported to SMU trainers and coaches.  In response, she continued on her same SMU

Rowing schedule but was instructed to engage in TENS Therapy and foam rolling.

132.     Heyman began her sophomore year in 2014 participating fully in the SMU

Rowing program, including the arduous and under-supervised weight lifting program

with Olympic lifts.  While her break over the summer somewhat resolved her hip pain, it

immediately returned once she began rowing and weight lifting again at SMU. As the

season progressed her hip pain worsened.

133.     As she continued to row, Heyman's back and hip pain continued to increase in

severity.  During the Spring of 2015, Heyman was limited in her ability to fully

participate in the rowing program.

134.     In response to her injuries, she was instructed to do physical therapy once or twice

a week, in addition to regular practices and weight lifting.

135.     Heyman complained weekly, if not daily, about severe back pain that would leave

her in tears during and after practice.  In response, she was told to continue stretching and

utilizing other rehabilitation techniques that had already proven ineffective for her.

136.     Eventually, Heyman's persistent back pain led her to get an MRI and X-Ray on

her hips and lower back on May 8, 2015.

137.     Heyman rowed for SMU in the Conference Championship on May 17, 2015.  The

night of the Conference Championship, after she had already raced, Heyman approached

Schuil to say goodbye, only to then be informed for the first time that she had a stress

fracture in her spine.  The information was given to her in passing by the trainer and she

was quickly and casually advised to not do any physical activity over the summer or bend

over at all.  Schuil then informed her that they would discuss physical therapy later as

they were not in an appropriate setting to discuss medical issues at that moment.  Just

over a month later, Heyman received a prescription for physical therapy.

138.      Beginning her junior year in the fall of 2015, Heyman was highly restricted due to

immense hip and back pain.  Symptoms eased somewhat with rest but returned

immediately when Heyman returned to rowing.

139.      Heyman participated in physical therapy once to twice weekly on her own time

during this period.

140.      On January 25, 2016, Heyman was medically disqualified from rowing.

141.      Heyman experienced retaliation as result of her injuries.  Prior to being informed

of her medical disqualification, all of her belongings in the SMU rowing locker room

were dumped into a box for medically disqualified athletes.  Because her belongings were

mixed together with all other medically disqualified athletes' belongings, it made it very

difficult for her to identify her belongings.  Additionally, SMU Rowing team members

were instructed to no longer speak to Heyman or other medically disqualified SMU

rowers.

142.      Heyman was also informed that she could no longer receive treatment in the SMU

training room.

143.      After being medically disqualified, Heyman was required to work for the SMU

Athletic Department to maintain her scholarship.  Heyman had to work 20 hours a week

during the spring and fall of 2016, the beginning of her senior year, all of which

conflicted with her academic schedule.

144.     While Heyman maintained a 90 percent scholarship for the remainder of her time

at SMU, as a result of her medical disqualification she missed out on the opportunity to

receive a full scholarship.  Even while injured, Heyman was the third fastest person on

the team.  Also, during Heyman's senior year, all seniors were put on a full scholarship

regardless of their skill level.  Therefore, Heyman likely would have received a full

scholarship her senior year, if not sooner based on merit.

145.     At this time, Heyman was substantially limited by her pain.  She could no longer

run under any circumstances.  Sitting or standing for extended lengths of time caused

days' of radiating pain, particularly sitting on hard surfaces.  Wearing high heel shoes

was very painful as was walking up stairs.  Heyman's daily activities were substantially

impaired.

146.     As a result of her persistent pain, after graduating, Heyman had surgery on her

hip.  After her surgery, Heyman participated in physical therapy at the Carrell Clinic.

147.     Throughout her participation as an SMU rower, Heyman was subjected to the

unconventional rowing form taught, and required, by the SMU rowing coaching staff.

148.     Throughout her participation as an SMU rower, Heyman was subjected to the

unreasonably rigorous training and practice regimen alleged herein.

149.     Throughout her participation as an SMU rower, Heyman was subjected to the

"Deal With It" culture alleged herein. SMU coaches and trainers dismissed her concerns

and complaints of continuing pain with a variety of explanations:

    a.  She needed to stretch more because her hip flexors were too tight.
    b.  Her shoes were not in the right place in the boat.

    c.  Her shins were abnormally long in proportion to her body and therefore her placement in the boat was affected.

    d.  Her legs may be two different lengths.

    e.  Wearing heels may be the cause of her injuries.

    f.  Her core was not strong enough.

    g.  Her bed was too hard.

    h.  Her bed was too soft.

150.      Throughout her participation as an SMU rower and during her period of rehabilitation, Heyman was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

151.      Heyman's surgeon informed her that she is certain to have arthritis in the future and will need a bilateral hip replacement in 20-30 years. Despite her surgery, Heyman's pain persisted, particularly getting into and driving a car. Further, due to the recovery of her surgery, she had to rescind a job acceptance and delay the start date of another position. Heyman still cannot sit or stand for long periods without significant discomfort.

**BACKGROUND FACTS RELATED TO PLAINTIFF KLEIN**

152.      Klein enrolled in SMU in the fall of 2013. She graduated from SMU in the spring of 2017.

153.      Prior to entering SMU, Klein rowed for both her middle and high schools competitively, as well as for a private rowing program.

154.      Klein first met Coach Wright at a college fair at Canadian Henley in 2012. At the time, Klein was uncertain about rowing in college due to having rowed competitively for such a long time and wanting a more normal college experience. Nevertheless, she agreed to visit the campus at Coach Wright's invitation and ultimately decided to attend. However, she informed the coaching staff that she wanted to get into SMU on her own as she was not sure she wanted to row.

155.     Klein had requested multiple residence halls, per SMU admissions procedure, that

were recommended to her for incoming freshman.  Despite these requests, she

surprisingly was not assigned to any of them once accepted into the school, which was

very uncommon.  Instead, Klein was assigned to a dorm that housed both lower and

upperclassmen and was farther away from campus than the other dorms.  Further, the

only freshmen in the dorm were rowers and male swimmers.  Her two assigned

suitemates were freshman rowers and most of the girls in her hall were SMU rowers.  It

quickly became clear that the only people she knew were rowers.  Despite initially not

wanting to row, Klein's entire SMU experience revolved around SMU rowing and she

felt as if she had no choice but to join SMU Rowing.

156.     Plaintiffs are informed, believe and on that basis allege that the SMU Rowing

coaching staff specifically put female students they wanted to row in the dorms with their

recruited freshmen to entice the students to join the team.

157.     Upon joining the team, like the others, Klein was provided a physical which did

not reveal any medical issues and resulted in her being able to participate fully in SMU

Rowing activities.

158.     While Klein was technically a walk-on, she quickly began rowing with the varsity

as opposed to the novice team due to her prior experience.

159.     Klein began to experience hip pain in approximately February of 2015, during her

sophomore year at SMU.  She continued to row throughout the season, despite feeling

pain in her hips every day.  Despite informing SMU of her pain, she was not provided a

doctor's appointment until May of 2015.  This appointment was set only a couple of days

before the Conference Championships.  She received X-Rays and was prescribed

Naproxen and Celebrex for her pain in order for her to race at the Conference
Championships.  Due to the lateness of her appointment, she did not get results of her X-
Rays prior to the end of the rowing season.

160.	During the summer of 2015, Klein's pain persisted.  She worked as a hostess at a
restaurant and coached rowing at her high school.  She felt excruciating pain when either
standing or sitting for extended periods.  She visited a doctor independent from SMU for
the pain who informed her that the medicine prescribed to her was very strong and not
recommended for young adults.  The doctor also indicated that he thought she had labral
tears in her hips, and also indicated it was very uncommon to have labral tears in both
hips.

161.	When Klein returned to SMU in the fall of 2015, she met with Dr. Worrel due to
her ongoing symptoms.  She had an MRI and on or about September 2, 2015, she was
diagnosed with bi-lateral labral tears.

162.	Through the fall and winter of 2015, Klein was required to participate in physical
therapy on her own personal time, in addition to being required to attend practices,
though not being able to participate, and maintain her academic schedule.

163.	By this time, Klein's hip pain had increased significantly.  She was unable to
sleep through the night and would wake up in pain.  She struggled to walk to class or to
walk up a very small hill on the SMU campus.

164.	Throughout the course of her injury and attempts at rehabilitation, Klein was
treated improperly by coaching staff.  In November 2015, while Klein was stretching on
the floor during practice, Coach Paige Love ("Coach Love"), the novice team coach,
came over and told her to do the abdominal workout the other injured rowers were doing.

Klein informed Coach Love that she had already done her abdominal workout as part of her physical therapy and, as she was in a lot of pain, her physical therapist told her to take it easy. Coach Love continued arguing with her about it and then walked away, saying sarcastically, "must be a pretty significant injury if you can't even do abs." Klein then followed Coach Love to the ergometer room and informed her that she found her comments out of line and disrespectful as Coach Love knew that Klein's labrums were torn. Seemingly realizing her misstatement, Coach Love attempted to downplay the interaction, claiming she just wanted to see Klein's commitment to getting better.

165.    Klein emailed Coach Wright about the interaction with Coach Love and asked to meet with him. When they met, he indicated that the interaction was not a big deal and that Klein should move on as it was just a misunderstanding.

166.    In the winter of 2015, just prior to winter break, Klein was brought in to see Dr. Worrel who informed her that she would be medically disqualified. Though he indicated the paperwork would be done quickly, it took months to process, requiring Klein to continue to attend practice and watch, while also attending class and having to attend physical therapy on her own time during the 2016 spring semester.

167.    Klein's pain persisted when she returned for winter break in -2016 and greatly affected her personal life. For example, she attempted to see a movie in the movie theater but had to get up twice due to immense pain.

168.    Klein decided to get outside opinions from doctors not associated with SMU, who ordered additional testing to determine whether she had hip dysplasia. Despite SMU doctors only diagnosing Klein with labral tears and claiming curative therapy was simply

optional, these other doctors diagnosed her with hip dysplasia and recommended a hip periacetabular osteomy ("PAO") to address it.

169.     SMU doctors never diagnosed Klein with hip dysplasia and she only found out about it by seeking a second opinion from doctors independent from SMU.  Klein then informed SMU about this diagnosis.  She also informed SMU that her independent doctors informed her that with her hip dysplasia, she should never have experienced the severity of labral tearing that she did.  Due to her hip bone being in an unusual position, impingement between the labrum and bone that causes labral tears is much less likely to occur, suggesting the strain on her body while rowing for SMU created such a severe angle in her hips, it lead to the labral tearing.

170.     After being medically disqualified, in the spring of 2016, Klein met with Coach Wright who assured her that she and the other medically disqualified students would remain part of the SMU Rowing family.  In actuality, she was required to return the majority of her rowing gear, which is usually reserved as a punishment for people who quit.

171.     Klein also experienced retaliation as a result of her injuries and her medical disqualification.  The coaching staff informed the remaining rowers not speak to Klein, or the other medically disqualified rowers.  They also kicked Klein and the other medically disqualified rowers out of the locker room which had never been done before.  Upon going to the locker room to remove her belongings, she found a large box on the floor where all her belongings had been dumped and mixed with the belongings of other medically disqualified rowers.

172.     Klein had surgery on her hip in May of 2016.

173.     When she returned to school for her senior year in the fall of 2016, she was still recovering, learning how to walk and run again.  After her medical disqualification, Klein continued to be treated by SMU physicians and physical therapists. She was, however, prevented by SMU from getting treatment with Ervin on campus.  She required substantial physical therapy, but was no longer allowed by SMU to meet with the Carrell Clinic physical therapist when he came to the SMU campus.  Therefore, despite still recovering from her surgery and the discomfort it caused, Klein had to drive to the Carrell Clinic for treatment.  Further, Klein was no longer allowed to use the weight room at SMU.

174.     Throughout her participation as an SMU rower, Klein was subjected to the unconventional rowing form taught, and required, by the SMU Rowing coaching staff.

175.     Throughout her participation as an SMU rower, Klein was subjected to the unreasonably rigorous training and practice regimen alleged herein.

176.     Throughout her participation as an SMU rower, Klein was subjected to the "Deal With It" culture alleged herein.

177.     Throughout her participation as an SMU rower, her injury, surgery and rehabilitation, Klein was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

178.     Klein has been informed by doctors that she will need a full hip replacement in the next 10 to 20 years.  Further, she has been informed that her hip replacement may not hold up and that she may need additional hip replacements thereafter.  Due to remaining pain in her hips, particularly her left hip, and only having had surgery on her right, she will likely require another PAO followed by hip replacement on her left hip.

179.      Prior to her injury, Klein had a less than 50 percent scholarship.  While she maintained this scholarship for the remainder of her time at SMU until her graduation in 2017, her medical disqualification prevented her from any increases.  During senior year, all seniors were put on a full scholarship regardless of their skill level.  Therefore, Klein likely would have received a full scholarship her senior year

### BACKGROUND FACTS RELATED TO PLAINTIFF SEVERSON

180.      Severson first enrolled at SMU in the fall of 2013. She graduated from SMU in the spring of 2017.

181.      Prior to attending SMU, Severson rowed competitively for her high school and for a private rowing program.

182.      Severson first met Coach Hooper at a recruiting fair for rowing in 2012, the spring of her junior year in high school. Initially, Hooper discouraged her from attending SMU, telling her grade point average was not high enough.

183.      Several weeks later, however, Coach Wright contacted Severson and began aggressively recruiting her. In several lengthy conversations, Coach Wright and Coach Hooper boasted about the quality and accessibility of SMU's training facilities. They assured Severson that SMU Rowing was like a family and that they all looked out for one another.

184.      Severson signed a letter of intent in November 2012 and received a 75 percent scholarship from SMU Rowing.

185.      Severson's physical was completely normal and she was under no restrictions when she began rowing for SMU.

186.     At Coach Wright's direction, Severson completely changed the rowing technique she used. The technique Coach Wright insisted that SMU rowers use was different that any technique she had seen or been taught during her high school experience. Eager to please and advance in the program, Severson mastered the unusual technique quickly.

187.     Severson noticed pain in her hip the spring of her freshman year in 2014. Coach Wright advised her to take the summer off to rest her hip so that she would ready for the fall season.

188.     A couple of weeks into the fall 2014 season, Severson was in even more pain. She complained repeatedly to Schuil, who recommended treatment including ice and TENS therapy. The pain persisted and Severson's request for an MRI was finally granted in October 2014.

189.     Severson was repeatedly subjected to comments from the coaching staff belittling her for being in pain and telling her to row through it.

190.     Severson underwent months of physical therapy, sometimes at SMU and sometimes at the Carrell Clinic. She was told to find her own transportation to the Carrell Clinic whether it be from a friend or a ride share service. She spent Spring Break 2015 undergoing physical therapy at the Carrell Clinic.

191.     She was medically disqualified in February 2016.

192.     Severson also experienced retaliation as a result of her injuries and her medical disqualification.  The coaching staff directed the remaining rowers not speak to Severson or the other medically disqualified rowers.  They removed Severson's belongings from the locker room, telling her they would be donated to Goodwill if she did not pick them

up immediately. Contrary to the promises that she would be treated like "family," the coaching staff ostracized her and encouraged other team members to do the same.

193.      Severson was diagnosed with a labral tear in her left hip and will need surgery to repair it.

194.      Throughout her participation as an SMU rower, Severson was subjected to the unconventional rowing form taught, and required, by the SMU Rowing coaching staff.

195.      Throughout her participation as an SMU rower, Severson was subjected to the unreasonably rigorous training and practice regimen alleged herein.

196.      Throughout her participation as an SMU rower, Severson was subjected to the "Deal With It" culture alleged herein.

197.      Throughout her participation as an SMU rower, injury and rehabilitation, Severson was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

## **BACKGROUND FACTS RELATED TO PLAINTIFF TATE**

198.      Tate first enrolled at SMU in the fall of 2012. She graduated in the spring of 2016.

199.      Prior to attending SMU, Tate had no previous rowing experience, instead having played basketball in high school.  Noticing her athletic ability, McLean began recruiting Tate in the spring of 2012.  To explore her ability and desire to row, Tate's parents paid for a couple of private rowing lessons at a rowing club.  Tate was then offered an official recruiting visit to SMU where she first met Coach Wright and Coach Hooper.  At the visit, Tate was offered a 50 percent scholarship.  Prior to her visit, Tate had applied to SMU and was denied.  After the scholarship offer, she requested the admissions board

reconsider her admissions decision.  They did and she was accepted to SMU in May of 2012, at which time she signed a letter of intent.

200.      Upon entering SMU, SMU provided Tate with a physical which did not reveal any concerns or result in any restrictions.

201.      During her first semester, Tate alternated time training with both the SMU Rowing novice and varsity teams.  She received training with the coaching staff on rowing technique primarily on the ergometers.  By the spring semester of her freshman year, Tate competed in all the races on the second varsity boat.  Tate also competed in an indoor "2K" competition and in an optional "10k" ergometer workout during her freshman year which did not count towards the maximum time allowed by the NCAA to practice.

202.      By the end of Tate's first semester and the beginning of her second semester, Tate was training with the varsity.  She first complained about minor back pain in late 2012 or early 2013.  She went to see the trainer, Yoder, who informed her that she was just experiencing "new to rowing" pains, and that she should heat before practice and ice afterwards.

203.      During the spring semester of her freshman year Tate began to complain to SMU about hip pain.

204.      Through the summer of 2013, she followed the assigned training regimen.  Her hips continued to hurt while she engaged in these exercises but assumed it was due to her being "new to rowing" as she was instructed and pushed through the pain.

205.     In the fall of 2013, after competing in a race for the varsity in Oklahoma, Tate

told Coach Hooper and Coach Wright that she was in serious pain and could not continue

to compete in her condition.

206.     Athletic Trainer Schuil evaluated Tate and decided to have Tate sit out for a

couple of weeks.  After a few weeks of no activity, Tate's pain did not subside and so she

saw Dr. Worrel.  Dr. Worrel recommended physical therapy and Tate began attending

physical therapy at SMU for the remainder of the semester.

207.     In the beginning of the Spring 2014 semester, Tate attended winter training camp

and tried to ease back into rowing.  However, her pain persisted leading to her get her

first MRI shortly thereafter.  The MRI revealed Tate had labral tears on each hip.

208.     As a result of her labral tears, Dr. Worrel and Schuil gave Tate the options of

either continuing physical therapy to strengthen her muscles and keep rowing or have

surgery and stop rowing.  In a meeting with Tate's parents, Dr. Worrel informed them

that if Tate decided to have the surgery and follow his recommendation to not row

afterwards, he could not sign a medical disqualification because technically Tate could

row after the surgery though he would not recommend it.

209.     When Tate's father informed Dr. Worrel that if she did not obtain a medical

disqualification, and could not continue to row, she would lose her scholarship and be

unable to continue attending SMU, Dr. Worrel suggested to Tate's father that he figure

out another way to pay for Tate to stay at SMU.

210.     As a result of her meeting with Dr. Worrel, Tate chose to continue doing physical

therapy in an attempt to avoid surgery.  She remained in physical therapy all of the spring

of 2014.  As she was still in pain at the end of the school year, she was given cortisone

injections.  The SMU coaches and training staff agreed that Tate should take the summer off from any rowing or training activity.

211.       Upon returning to school in the fall of 2014, Tate was still in pain and informed Schuil.  Schuil agreed that Tate needed to be done with rowing and have the surgeries. She then met with Coach Wright and informed him of the amount of pain she remained in and that she did not think she could row anymore.  He agreed and, soon after, she was medically disqualified.  Tate then scheduled her first surgery for January of 2015.  Tate ultimately had two surgeries performed by Dr. Muller on her hips.

212.       In all, Tate had three sets of contrast injection MRI's, three rounds of cortisone injections, and also did cryotherapy.  She underwent three years of physical therapy at the Carrell Clinic.   She continued to treat with SMU medical providers until her graduation in May 2016.

213.       Tate's injuries made things significantly more challenging for her academic career.  She was in a lot of pain sitting on class for long periods of time.  She also had to modify her journalism class load because she could not carry around a camera and go out on photo shoots.

214.       Throughout her participation as an SMU rower, Tate was subjected to the unconventional rowing form taught, and required, by the SMU Rowing coaching staff.

215.       Throughout her participation as an SMU rower, Tate was subjected to the unreasonably rigorous training and practice regimen alleged herein.

216.       Throughout her participation as an SMU rower, Tate was subjected to the "Deal With It" culture alleged herein.

217.     Throughout her participation as an SMU rower, her injury, surgeries and rehabilitation, Tate was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

218.     Tate believed the SMU coaching, training and medical staff that her injuries were a normal result of rowing. It was never suggested to her nor did she have any information that led her to inquire whether her injuries were caused by incompetent coaching, improper technique, inadequate training, or substandard medical care. Until she learned of the audit and the information Plaintiffs McGowan and Heyman discovered in the fall of 2017, Tate did not have reason to inquire further as to the real cause of her injuries.

219.     After graduating from SMU, Tate was informed that she was no longer eligible to have SMU as her secondary insurance.  She is still in pain and would like to see a physical therapist, but cannot as she cannot afford it with her current insurance plan.

220.     Tate's symptoms still persist and she has been informed she will need additional procedures including hip replacement in the future.  She has been told by medical professionals that her hips will never fully recover and that hip pain will be a part of her life forever as her "new normal."

## BACKGROUND FACTS RELATED TO PLAINTIFF JENNINGS

221.     Jennings enrolled in SMU in the fall of 2013. She graduated from SMU in the spring of 2017.

222.     Prior to joining SMU Rowing, Jennings had previously rowed for a highly competitive club team during her junior and senior years of high school.  Her club team competed with men's teams and was comprised of several women who went on to row in college.  During this time, she also had a personal trainer who taught her proper strength

training and weight lifting techniques, as well as a rowing coach to help her rowing

technique and work on the ergometer.

223.        Jennings was invited for an official recruiting visit to SMU in the fall of 2012.

Eventually Roe was offered a 50 percent scholarship to attend SMU and signed a letter of

intent in November of 2012.

224.        Jennings took a physical that did not result in any limitation of her participation in

SMU Rowing.

225.        In mid-September of 2013, during a rowing test, Jennings felt a tearing and

painful popping in her hips approximately halfway through the test.  She attempted to

stop the race but was told to continue.  Once she finished the race, she immediately went

to the training room to see Schuil.  She was originally informed that she had a hip flexor

injury and was prescribed modified training which involved single boat rowing, elliptical,

core, and physical therapy exercises meant to address her hip flexor.  This continued

through December and, despite repeatedly requesting an MRI, one was not scheduled

until the week before the end of the semester.

226.        Jennings repeatedly told the coaching staff that she experienced pain while

performing the rowing technique as instructed.  In response, the coaching staff told her

that "it will feel better when your body gets used to it.  Give it time."  She even emailed

Coach Love regarding her concerns but never received a response.

227.        Jennings struggled substantially with her grades due to her inability to sit through

classes or concentrate without immense hip pain.  Due to her lower grade point average,

on top of her other commitments including classes, practice, and treatment, Jennings had

to attend extra study hall hours.

228.     After the MRI, SMU informed Jennings that she had a torn and fraying labrum and that she needed surgery.  She decided to get a second opinion from a private doctor who warned her that the surgery could pose a high risk for arthritis and hip replacement later in life.

229.     Jennings proceeded with the surgery on her right hip on or about February 13, 2014 and her left hip on or about April 10, 2014.  Though she had received recommendations to another surgeon from a doctor independent from SMU, Jennings was informed that if she did not use Dr. Muller, SMU would not pay for her surgery.

230.     After the surgeries, Jennings participated in and completed her physical therapy at the Carrell Clinic and also at an independent gym at home over the summer.

231.     Jennings returned to SMU in the fall of 2014 and began training with Coach Hooper in the mornings including work on technique, core, and cardio.  Throughout this training, Jennings's hip pain persisted, particularly in her left hip, leading her to return to Dr. Muller on several occasions.

232.     From the time she began complaining of pain, Wright, Hooper and Schuill told Jennings that it was the shape of her hips that caused the tears. Coach Wright used his hands to represent a ball and socket joint and told her that when the ball is not "perfectly shaped" it will catch and cause tears, which is "what caused [her] injury."

233.     Despite her efforts, Jennings's hip pain persisted.  She continued to hear frequent popping and clicking despite her surgeries.  She had several more consultations with the SMU surgeon and additional MRIs. Ultimately in April 2015, was medically disqualified.

234.     To maintain her scholarship, Jennings was required to work for the athletic department throughout the 2015-2016 and 2016-2017 school years and continued to

suffer retaliation. Despite promises, Jennings was not included in SMU Rowing

generally, and the coaching staff rarely reached out to Jennings until she was asked to

produce a video for the SMU rowing end of the year banquet.

235.    Throughout her participation as an SMU rower, Jennings was subjected to the

unconventional rowing form taught, and required, by the SMU rowing coaching staff.

236.    Throughout her participation as an SMU rower, Jennings was subjected to the

unreasonably rigorous training and practice regimen alleged herein.

237.    Throughout her participation as an SMU rower, Jennings was subjected to the

"Deal With It" culture alleged herein.

238.    Throughout her participation as an SMU rower, her surgery and period of

rehabilitation Jennings was subjected to the substandard, second class athletic training

and medical attention afforded to SMU rowers.

239.    Jennings believed the SMU coaching, training and medical staff that her injuries

were a normal result of rowing. It was never suggested to her nor did she have any

information that led her to inquire whether her injuries were caused by incompetent

coaching, improper technique, inadequate training, or substandard medical care. Until she

learned of the audit and the information Plaintiffs McGowan and Heyman discovered in

the fall of 2017, Jennings did not have reason to inquire further as to the real cause of her

injuries.

240.    Jennings's hip pain persists to this day increasing the likelihood of the need for

additional surgeries and hip replacements as well as arthritis and other lifelong

complications.

## BACKGROUND FACTS RELATED TO PLAINTIFF MOORE

241.    Moore enrolled in SMU in the fall of 2010. She graduated from SMU in 2014.

242.    Prior to attending SMU, Moore had no previous rowing experience.  She first learned of SMU Rowing after seeing a flyer on campus in the fall of her freshman year. She then attended an information session where several of the coaches and recruited freshmen were present.  There were no try-outs and, instead, anyone who wanted to join was able to join.  She also learned that scholarships were available based on performance at the varsity level.

243.    Moore took part in a physical that did not reveal any injuries or concerns to prevent her from taking part in SMU Rowing.

244.    Moore rowed for the SMU Rowing novice team from 2010 to 2011 and then on the varsity team from 2011 to 2014.

245.    Moore first began complaining of pain as a result of participation in rowing during her freshman year.  Moore found that the coaching staff either did not listen or expressed disappointment in rowers who complained of injury.  During her freshman year, Moore became uncomfortable going to the training room for treatment.  The trainer, who also worked with football and soccer at SMU, had little time for rowers. The trainers treated rowers like "second class citizens."  Despite repeated complaints of pain, the trainer would quickly and dismissively provide ice, heat, or TENS Therapy on rare occasions.

246.    During Moore's sophomore year, she was diagnosed by SMU with a labral tear in her shoulder.  In response, she was given no referrals to treatment such as physical therapy; instead, it was merely suggested that she receive cortisone and continue to

receive ice, heat, and TENS Therapy. The SMU athletic trainer at the time, Drew Yoder
("Yoder"), also worked with the football team and appeared to have little time or concern
for the rowers.

247.     Nevertheless, despite the pain and diagnosed injury, Moore continued to
participate in SMU Rowing, including rowing for the varsity.

248.     Moore began her junior year at SMU in 2012.  Her pain persisted and her ongoing
complaints continued to be unreasonably disregarded and ignored.  During an ergometer
workout, she called Coach Hooper on her cell phone to explain the pain she was
experiencing.  In response, Hooper told her she "needed to understand the difference
between good pain and bad pain."  As a result, Moore felt pressured to continue the
workout.  At the end, she could not stand or walk and was doubled over in pain.

249.     Approximately one month later, Moore was diagnosed by SMU with a right labral
hip tear and two herniated discs in her back. Coach Wright drew on her X-Ray
diagnosing her with "a bony growth" as if he was an expert on hip labral tears and
"showed her" where her labrum was frayed.

250.     While she no longer participated in the weight room, regardless of her injuries,
Moore continued to row for the team. When she complained of pain in her left hip, she
was told that a labral tear was likely but unless she wanted to have surgery there was no
reason to have an MRI.  She was offered anti-inflammatory medication. and despite
suffering back injuries, hip injuries and shoulder injuries, physical therapy was never
prescribed.

251.     Going into her senior year at SMU, as a result of her negligible treatment to this
point, Moore began personally paying for cryotherapy outside of SMU just to get her

through her rowing commitments.  During her senior year at SMU, in addition to her

other injuries, Moore was also diagnosed with bilateral compartment syndrome in her

forearms.  After this injury she was, for the first time, prescribed physical therapy by

Schuil, who was the new trainer at that time for SMU Rowing.  Moore continued to row

through the end of her senior year on the first varsity boat.

252.      Coach Wright offered a variety of explanations and excuses for the type of

injuries that were occurring, including the following:

253.      The injury was a common one and "everyone is walking around with labral hip

tears."

254.      Every athlete diagnosed with a labral hip tear was predisposed to it.

255.      The "injury excuse" was a culture on the team and the rowers tried to get

medically disqualified so they could stop rowing but maintain their scholarships.

              i.

256.      Throughout her SMU Rowing career, Moore felt pressured to continue working

through her injuries.  Coaches often threatened the rowers with scholarship removal,

forcing them to race and practice through pain.  The coaches would push rowers through

injuries, blaming them on rowers "being too skinny," "partying too hard," or "being

lazy."

257.      Throughout her participation as an SMU rower, Moore was subjected to the

unconventional rowing form taught, and required, by the SMU Rowing coaching staff.

258.      Throughout her participation as an SMU rower, Moore was subjected to the

unreasonably rigorous training and practice regimen alleged herein.

259.      Throughout her participation as an SMU rower, Moore was subjected to the "Deal With It" culture alleged herein.

260.      Throughout her participation as an SMU rower, her injuries and rehabilitation, Moore was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

261.      Moore idolized the SMU coaches and accepted their explanations for injuries without any reason to question them. She was often held up as an example to other injured rowers as one who could keep going even with injuries. Coach Wright often told other rowers that Moore had labral hip tears and was still rowing and if she could, they should be able to as well. Until she learned of the audit and the information Plaintiffs McGowan and Heyman discovered in the fall of 2017, Moore did not have reason to inquire further as to the real cause of her injuries.

262.      After her graduation from SMU, Moore began coaching high school rowing in Connecticut. Coach Wright called her in Connecticut in late 2015 to tell her that SMU planned to medically disqualify and kick all the injured rowers off the team. He told her that the injured rowers would have to return all of their gear and would no longer be part of the team. He reiterated that hip injuries were a part of the culture on the SMU team and that "the athletes needed to see what happened when you got diagnosed with hip labral tears. You couldn't be a part of the team anymore."

263.      Plaintiffs are informed, believe and on that basis allege that the injured rowers Coach Wright referred to in his conversation with Moore included Plaintiffs Heyman, Klein and Severson.

264.      To this day, Moore remains in constant pain.  Her herniated discs have not

improved and there are mornings she wakes up and cannot move.  She can throw her

back into week long spasms through simple actions like putting on a sock.  Her pain

prevents her from walking too much, standing too long, or sitting too much.  She

anticipates needing hip replacement surgery and back surgery later in life should her

symptoms persist.  As she ages, her back more easily and often goes into spasm and her

shoulders ache more and more if she moves them too much or in the wrong way.

## BACKGROUND FACTS RELATED TO PLAINTIFF KADE

265.      Plaintiff Kade enrolled at SMU in the Fall of 2010 and graduated in the Spring of

2014.

266.      Prior to joining SMU Rowing, Kade had previously rowed for her high school

club rowing team.  As part of her high school rowing training, she participated in erg

circuits, sweep rowing, and weight training.

267.      Kade learned about the opportunity to row for SMU via a flyer in the campus

cafeteria.  In the Fall of 2010, she went to SMU rowing tryouts, which essentially

consisted of an introduction to the program, and joined the SMU rowing team as a walk-

on.

268.      Kade took a physical that did not result in any limitation of her participation in

SMU Rowing.

269.      Kade initially joined the Novice team and in the Spring of 2011 was promoted to

the Varsity team.

270.      In the Fall of 2011, Kade began experiencing pain in her lower right leg.  She

reported her pain to SMU personnel but was largely ignored and told that pain was

simply something that college athletes had to deal with.  She was forced to complete physical tests, including a 3-mile run, a 6-km erg test, and various weight training activities, all with lower leg pain.  She eventually broke down crying because of her leg pain while performing back squats.  Finally, at this point, SMU ordered an MRI which revealed that Kade had suffered a stress fracture in her lower right leg.  Thus, she was forced by SMU to engage in the aforementioned strenuous physical activities while enduring the pain of a stress fracture, when she was initially ignored by SMU personnel.

271.    In the Spring of 2012, Kade  reported hip pain to SMU personnel. Here again, Kade was told by SMU personnel that pain was just something that college athletes had to deal with.  She was encouraged by SMU personnel to push through the pain and continue training.  She was also told that her hip pain was due to improper nutrition, improper recovery techniques, as well as genetically predisposed hip deformities.

272.    On one occasion during practice, Kade asked if she could sit out due to her hip pain.  She was encouraged to continue training, even though she could barely walk.  She ended up completing practice and crying while walking back to the boathouse, unable to carry the weight of the boat back into the racks.

273.    In April of 2012, Kade was pulled from the boat due to her debilitating hip pain.  She was diagnosed with bi-lateral hip tears and had surgery on her right hip in May of 2012.  On February 19, 2013, she was medically disqualified by SMU.  Then in August of 2013, she had surgery on her left hip.

274.    Kade struggled substantially with her grades due to her inability to sit through classes or concentrate without immense hip pain.  In fact, during one three hour long

class, Kade was unable to sit for the full three hours, and was forced to get out of her seat and kneel on the ground due to her hip pain.

275.     Throughout her participation as an SMU rower, Kade was subjected to the unconventional rowing form taught, and required, by the SMU rowing coaching staff.

276.     Throughout her participation as an SMU rower, Kade was subjected to the unreasonably rigorous training and practice regimen alleged herein.

277.     Throughout her participation as an SMU rower, Kade was subjected to the "Deal With It" culture alleged herein.

278.     Throughout her participation as an SMU rower, her surgery and period of rehabilitation Kade was subjected to the substandard, second class athletic training and medical attention afforded to SMU rowers.

279.     Kade believed the SMU coaching, training and medical staff that her injuries were a normal result of rowing. It was never suggested to her nor did she have any information that led her to inquire whether her injuries were caused by incompetent coaching, improper technique, inadequate training, or substandard medical care. Until she learned of the audit and the information Plaintiffs McGowan and Heyman discovered in the fall of 2017, Kade did not have reason to inquire further as to the real cause of her injuries.

280.     Kade's hip pain persists to this day increasing the likelihood of the need for additional surgeries and hip replacements as well as arthritis and other lifelong complications.

## FIRST CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF GENDER
## IN VIOLATION OF 20 U.S.C. § 1681
## (TITLE IX)

281.     Plaintiffs incorporate all paragraphs of this Complaint is if fully set forth herein.

282.     Plaintiff Kelly McGowan was and continues to be provided unequal treatment and benefits as a member of the SMU Rowing team.

283.     Plaintiffs Jessica Clouse, Lindsey Heyman, Meghan Klein, Sydney Severson, Rebekah Tate,  Marissa Jennings and Lauren Moore were provided unequal treatment and benefits as members of the SMU Rowing team. This unequal treatment continued from the time of their enrollment, throughout their participation as active members of the team, as well as during and after their injuries, surgeries and rehabilitation until their graduation from SMU.

284.     SMU, through its Athletic Director and the coaching staff, knew that the all-female rowing team received inequitable funding and unequal treatment and benefits as compared to male sports and acted intentionally when it discriminated against Plaintiffs in violation of Title IX.

285.     As a proximate result of Defendant's discriminatory actions in violation of Title IX with respect to athletic treatment and benefits, Plaintiffs have been denied the full educational, economic, physical, psychological and social benefits of athletic participation. They have suffered and will continue to suffer irreparable harm and damages associated with, among other things, lost opportunities, loss of future educational and employment opportunities, emotional distress, physical pain and suffering, and the denial of equal opportunity because of sex.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

286.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

287.     At all times relevant, a special relationship existed between Plaintiffs as student-

athletes and Defendant SMU.

288.    Plaintiffs were all recruited to join the SMU rowing team and all were offered and received scholarship funds in exchange for their athletic participation.

289.    At all times relevant, Defendant SMU owed a duty to each of the plaintiff student athletes to provide her with competent coaching, adequate supervision and appropriate medical care.

290.    Through the acts and omissions of its coaching, training and medical staff, Defendant SMU breached its duty to Plaintiffs by

    a.  failing to hire, train, supervise and retain qualified competent coaching, training and medical staff;

    b.  failing to provide proper supervision, training and instruction regarding appropriate rowing technique;

    c.  failing to provide proper supervision, training and instruction regarding appropriate weight lifting technique;

    d.  implementing an unreasonably rigorous training schedule;

    e.  failing to provide experienced athletic trainers and timely medical care;

    f.  failing to provide access to an adequate staff of athletic trainers and medical providers;

    g.  failing to provide appropriate medical care consistent with the applicable standard of care

    h.  requiring rowers to continue to train while injured

    i.  failing to demonstrate concern for complaints and recklessly disregarding a pattern of similar injuries;

j.  creating a heightened risk of injury beyond that expected in the sport of rowing.

291.     But for the intentional and negligent acts and omissions of Defendant and these

violations of the standards of care and statute set forth herein, Plaintiffs would not have

been injured.  Defendant's intentional and negligent acts and omissions therefore amount

to negligence, negligent failure to warn, train and/or educate, and negligence per se.

292.     As a proximate result of the above-described conduct, Plaintiffs have suffered,

and continue to suffer, great pain of mind and body, physical injury, emotional distress,

physical manifestations of emotional distress, loss of enjoyment of life; have suffered and

continue to suffer spiritually; were prevented and will continue to be prevented from

performing Plaintiffs' daily activities and obtaining the full enjoyment of life; and have

incurred and will continue to incur expenses for medical treatment.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

293.     Plaintiffs incorporate by reference all preceding facts and allegations set forth

above.

294.     Plaintiffs' actions are based on Defendant SMU's affirmative involvement in

manipulating and misinforming Plaintiffs as to the cause of their physical injuries and

SMU's practice of discouraging Plaintiffs from seeking second opinions or obtaining

treatment from health care providers not affiliated with SMU.

295.     Injured rowers were ostracized and warned not to speak to their teammates.

Likewise, their teammates were warned not to speak to them.

296.     Plaintiffs are informed, believe, and on that basis allege, that the rowing program

accounted for the second highest amount of medical costs for all SMU athletic programs

behind football.  The football program was comprised of approximately 120 athletes, and

football is a contact sport.  By contrast, the rowing team was comprised of approximately 30 athletes and is a non-contact sport.

297.     SMU Rowing coaching staff as well as other SMU athletic staff, including the Athletic Director, were aware of, intentionally disregarded and actively concealed the nature, extent and cause of the injuries being suffered by rowers.

298.     SMU Athletic Director Rick Hart told Plaintiff McGowan and her parents in August 2017 that an audit had been performed of the rowing program by the Carrell Clinic and that recommended changes had been made. In September 2017, a physical therapist at the Carrell Clinic told Plaintiff Heyman the opposite during a physical therapy session. The therapist told Heyman that there was in fact an audit, but no changes had been made. SMU Rowing continued to use the same improper rowing techniques, the same dangerous weightlifting practices, and use the same inappropriate equipment.

299.      It was not until then, the fall of 2017, when Plaintiff McGowan and Plaintiff Heyman began discussing their injuries and experiences, including what they had both recently been told about the audit, that Plaintiffs had reason to inquire as to the real cause of their injuries. Troubled by this new information, McGowan and Heyman disregarded SMU's instructions not to speak to other injured rowers and discovered alarming similarities between their injuries and experiences.

At no point in time prior to the fall of 2017 did Plaintiffs understand that SMU's actions were the cause of their injuries. Nor could they reasonably have been expected to "inquire further," as all of their previous inquiries had been met with falsehoods and misinformation by SMU coaching staff, team doctors and training personnel.

300.     Therefore, the statute of limitations on Plaintiffs' Title IX claims and negligence claims are tolled by fraudulent concealment and equitable estoppel.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray this Court award Plaintiffs damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

Dated:  April 19, 2019

Respectfully submitted,

_/s/ Sheila P. Haddock_
Sheila P. Haddock (#00790810)
Attorney-in-charge
sheila@zalkin.com
Alexander S. Zalkin (*pro hac vice*)
alex@zalkin.com
Irwin M. Zalkin (*pro hac vice*)
irwin@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

THE ZALKIN LAW FIRM, P.C.


*/s/ Sheila P. Haddock*
Sheila P. Haddock (#00790810)
Sheila@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015


Dated: April 19, 2019